ANNA BELYUS, PROSECUTRIX, v. WILKINSON, GADDIS & COMPANY, ESSEX COUNTY COURT OF COMMON PLEAS, AND JOHN H. SCOTT, CLERK OF SAID COURT, RESPONDENTS.

Submitted October 12, 1934—Decided April 4, 1935.

Before Justices HEHER and PERSKIE.

For the prosecutrix, *Samuel J. Kaufman.*

For the respondent, *Edwin Joseph O'Brien.*

The opinion of the court was delivered by

HEHER, J. On August 4th, 1925, Michael Belyus, an employe of Wilkinson, Gaddis & Company, while upon his employer's premises, suffered burns which resulted in his death two days later. The jurisdiction of the workmen's compensation bureau was invoked by his dependents; and it was there determined that his death resulted from an accident which arose out of and in the course of his employment. The compensation provided by the act was awarded. *Pamph. L.* 1911, *p.* 134. On appeal, the determination of the Essex Common Pleas was that the prosecutrix had not sustained the burden of proving an injury by accident arising out of the employment. This is the decisive question.

These are the circumstances: The deceased had been employed as a stableman by the defendant corporation for upwards of thirty years. Some four months before the fatal accident befell him, the corporation's horse-drawn equipment was supplanted by motor vehicles. Decedent was unfitted for service in the new scheme of things. He was illiterate and without mechanical knowledge. His had been the menial service of a stableman; and while it may be true that there was little for a man of his limited capacity to do after this change was effected, he was continued in the company's employ. It may well be that the principal consideration for

his retention was a sense of gratitude for long and faithful service. The fact is, however, he was expected to do the things of which he was capable. And being naturally desirous of rendering service for the weekly stipend paid to him, he undertook, with the knowledge and acquiescence of his employer, to render such services as were within his power. For instance, the employer admits that he was on occasions called upon to cleanse the chassis of a motor vehicle, using a mixture of gasoline and kerosene provided for that purpose. On the morning of the fatal day, he reported for work at seven-fifteen A. M., as usual. He was seen at that hour, or shortly thereafter, in the garage. Between nine-thirty and ten A. M., he was observed in the stable, directly across the street, enveloped in flames. A pail was found inside the building, about one hundred feet from the doorway, containing a burning liquid that was unquestionably gasoline, or a mixture of that liquid and kerosene. The pail was close to a brick wall enclosing the furnace room. The proofs show that the furnace was not then in use; nor was anything discovered in the room that would account for the ignition of the content of the pail.

There was no evidence tending to show what decedent was doing at the time his clothing caught fire, except that given by one Stewart, then an employe of the defendant corporation, who testified that decedent, while "in flames and very much excited," said that "he was washing a pair of pants." A leading question put to the witness brought the reply that it was "the little boy's pants." The deceased was inside the stable when he found him in flames, coming "from out of another room." The witness called to another employe, one Helwig, for assistance; and it is significant that, while he was certain he and Helwig reached decedent at "almost approximately the same time," he would not say that Helwig was present when decedent made the asserted statement. He reiterated that, at this time, the deceased was unquestionably in severe pain—he "just merely groaned"—and that he (the witness) "was very much excited." He did not see the pail of burning liquid; it was in the room whence decedent came.

Helwig, although called as a witness by his employer, as well as by prosecutrix, gave no testimony relating to his ministration of aid to the deceased; nor did he testify to any statement made by the decedent.

. There was no testimony tending to corroborate the claim that decedent, at the time in question, was engaged in business of his own, *i. e.,* the washing of his boy's pants. No remnant of such a garment was found; and decedent's wife testified that her husband was not in possession of one belonging to their boy, who was then fourteen years of age. The fire in the pail was extinguished by employes of the defendant corporation. Helwig, called as a witness by the prosecutrix, described decedent as a "stableman." In reply to the question as to whether decedent made any statement after he reached him, Helwig said, "no statement at all, but all he was doing was groaning, he told me to get something to put on to cool him off, I put him in there to get his clothes off, such as he had on." Helwig was the foreman of the garage. As the deputy commissioner observed, neither the buckle nor a button was found to indicate that decedent was engaged in cleaning the mentioned article of wearing apparel when his clothes became ignited; there was no tangible evidence of the fact. He remarked: "Without questioning the veracity of the sole witness for the respondent, and laboring under the stress of strong excitement, it is quite possible that he misunderstood these few words of Belyus, under the extraordinary circumstances."

Whether this fatality arose out of and in the course of the employment is a mixed question of law and fact. Of course, the employer is not an insurer of his workman against all misfortune suffered in the course of his employment; the obligation imposed by section II of the statute is limited to accidents arising from or growing out of the risks peculiar to the nature of the work within the scope of the workman's employment, or incidental thereto, and accidents to which the employe is exposed in a special degree by reason of such employment. The words "arising out of" and "in the course of" are used conjunctively. In order to satisfy the statute,

both elements must co-exist; their concurrence is a pre-requisite to a right of action thereunder. As was said by Chief Justice Rugg in *McNicol's Case, 215 Mass.* 497; 102 *N. E. Rep.* 697, it is not easy "to give a comprehensive definition of these words which shall accurately include all cases embraced within the act and with precision exclude those outside its terms." The words "out of" refer to the origin or cause of the accident; the words "in the course of" to the time, place and circumstances under which the accident takes place. An accident arises "in the course of" the employment when it occurs (a) within the period of the employment; and (b) at a place where the employe may reasonably be; and (c) while he is reasonably fulfilling the duties of the employment, or doing something incidental to it. It arises "out of" the employment when the risk of such an occurrence is reasonably incident to the employment. Such a risk is one that grows out of or is connected with what a workman has to do in fulfilling his contract of service. And a risk may be incident to the employment when it is either an ordinary risk, directly connected therewith, or one extraordinary in character, indirectly connected with the employment because of its special nature. If the danger were one to which the employe was exposed because of the nature of his employment, the accident arose out of the employment. In fine, there must be a causal connection between the conditions under which the work is required to be done and the resulting injury. The injury must have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence. *Hulley* v. *Moosbrugger,* 88 *N. J. L.* 161; *Bryant, Adm'x,* v. *Fissell,* 84 *Id.* 72; *Hall* v. *Doremus,* 114 *Id.* 47; *Dietzen Co.* v. *Industrial Board,* 279 *Ill.* 11; 116 *N. E. Rep.* 684; *Ryerson* v. *A. E. Bounty Co.,* 107 *Conn.* 370; 140 *Atl. Rep.* 729.

While the prosecutrix has the affirmative of the issue, the burden of proof is sustained if the evidence be such as to induce a reasonable man to draw the inference that the injury arose out of and in the course of the employment. Such a conclusion in the instant case is not based upon mere con-

jecture or surmise; it is supported by logical reasoning from established facts. The circumstances shown justify inferences that bring this fundamental fact within the realm of probability. The accident occurred within the period of the employment, and at a place where the employe might reasonably be in the performance of his contract of service. And there is no basis in the proofs for a finding that the injury in question was intentionally self-inflicted, or the result of decedent's intoxication. The presumption is to the contrary. The burden of proof of such a statutory bar to compensation is, by the express requirement of paragraph 7, section II, of the act, placed upon the employer. The remaining hypotheses are: The decedent, at the time and place in question, was engaged either in his master's business or his own. There is no presumption that he was engaged in his own business. He was upon his employer's premises at a time when he was required to render service; and it is reasonably to be presumed, that, in these circumstances, he was there on his master's business. It is a logical inference that, in this environment, he sustained the fatal injuries while engaged in rendering the service at which he was employed. The employer maintained a store of gasoline and kerosene for decedent's use in the performance of the duties assigned to him. He was at liberty to follow his own bent in the doing of the work thus assigned; he was not required to wait for directions from his superior. The risk of explosion of vaporized gasoline, by combustion or through an extraneous agency, was indisputably a hazard of the employment—one that was reasonably incident to its use, in the performance of the service contemplated by the contract of employment.

Respondent urges, in this connection, that the deceased was permitted to use this inflammable liquid only when it was supplied by his foreman in person. There was evidence that this was the "usual," but not the invariable course of procedure, and that decedent sometimes, on his own initiative, obtained gasoline from the place of storage with the knowledge and acquiescence of his foreman. It is therefore reasonably inferable that the deceased was making proper prepara-

tions for the doing of his master's work; and, that being so, there was a causal connection between the injury and the conditions under which decedent rendered this particular service.

But the insistence of respondent is that the work requiring the use of such inflammable liquid was never done at the point where the flaming pail was found, and the theory is suggested that decedent, while using the liquid, struck a match "for the purpose of smoking;" and it is urged that this was "purely a personal matter," and in no sense one to "further the interests of the employer," and therefore the accident cannot be said to have arisen out of the employment.

But the thoughtless and negligent use of a match, or heedlessness in smoking, while the deceased was so engaged in his master's service, would not defeat a claim for compensation under the act. The obligation to make compensation is imposed upon the employer without regard to the negligence of the employe. Paragraph 7, section II, of the statute provides that compensation, in cases of personal injury or death of an employe resulting from an accident arising out of and in the course of his employment, shall be made *"in all cases* except when the injury or death is intentionally self-inflicted, or when intoxication is the natural and proximate cause of the injury." See *Dixon* v. *Andrews,* 91 *N. J. L.* 373; *affirmed,* 92 *Id.* 512; *Taylor* v. *Seabrook,* 87 *Id.* 407.

The legislative design indisputably was to exclude negligence of every character and degree as a determinative in the classification of compensable accidents. While an employe "willfully negligent" cannot recover under section I, no such limitation is imposed by section II; compensation is required "in all cases" coming within its provisions, with the two mentioned exceptions, *i. e.,* when the injury or death is intentionally self-inflicted, or intoxication is the natural and proximate cause thereof.

It may well be that an injury resulting from the employe's *intentional or willful misconduct* does not arise out of and in the course of the employment, within the intendment of the statute. But mere negligence does not fall into that cate-

gory. The word "willful" imports that the conduct was deliberate, and not merely a thoughtless act on the spur of the moment, or an act showing a lack of judgment; it connotes the idea of premeditation, obstinacy and intentional wrongdoing—the intentional doing of something either with knowledge that it is likely to result in serious injury, or with a wanton and reckless disregard of its probable consequences. *Beckle's Case,* 230 *Mass.* 272; 119 *N. E. Rep.* 653; *Johnson* v. *Marshall Sons & Co.* (1906), 94 *L. T.* 828; 8 *W. C. C.* 10; (1906) *A. C.* 409; *In re Burns,* 218 *Mass.* 8; 105 *N. E. Rep.* 601; *In re Nickerson,* 218 *Mass.* 158; 105 *N. E. Rep.* 604; *Gregory* v. *Oklahoma Operating Co.,* 139 *Okla.* 243; 282 *Pac. Rep.* 139. There is no evidence tending to establish such misconduct. There is a presumption against it.

And while smoking under the conditions here presented may be said to have increased the risk reasonably incident to the employment, that may ordinarily be predicated of every negligent performance of duty. Here there was no evidence that smoking was banned by rule or order governing the deceased servant or other employes of the respondent corporation. Smoking by workmen while engaged in the performance of their duties is ordinarily regarded as harmless, and ofttimes conducive to efficiency, depending, of course, upon the character of and the conditions surrounding the work. Where, as here, smoking by the employe did not create any hazard except on the comparatively rare occasions when he was required to use gasoline, thoughtless smoking while in the danger zone constituted mere negligence in the performance of the particular duty, and the consequent increase in risk does not of itself create a bar to the statutory benefit. The line of demarcation is that which separates acts within and those beyond the sphere of the employment. "A clear distinction exists in cases under the Workman's Compensation acts between doing recklessly or negligently a thing which the workman is employed to do and doing a thing altogether outside and unconnected with the employment. A peril which arises from the negligent or reckless manner in which he does the work which he is employed to do may well,

and in most cases rightly, be held to be a risk incidental to the employment." *Honnold on Workmen's Compensation*, § 112, citing *Barnes* v. *Nunnery Colliery Co., Ltd.* (1911), 4 *B. W. C. C.* 43, *C. A.*, and (1912), 5 *B. W. C. C.* 195 *H. L.; Mann* v. *Glastonbury Knitting Co.*, 90 *Conn.* 116; 96 *Atl. Rep.* 368. This principle was applied in the following cases: *Ocean Accident and Guaranty Corp.* v. *Pallaro*, 66 *Col.* 190; 180 *Pac. Rep.* 95; *O. L. Shafter Estate Co.* v. *Industrial Accident Commission*, 175 *Cal.* 522; 166 *Pac. Rep.* 24; *Haller* v. *City of Lansing*, 195 *Mich.* 753; 162 *N. W. Rep.* 335; *L. R. A.* 1917 E 324.

And disobedience of an order or breach of a rule is not of itself sufficient to disentitle a workman to compensation, so long as he does not go outside the sphere of his employment. That does not necessarily take him out of the course of his employment. "There are prohibitions which limit the sphere of employment, and prohibitions which deal only with conduct within such sphere. A transgression of a prohibition of the latter class leaves the sphere of employment where it was, and consequently will not prevent recovery of compensation. A transgression of the former class carries with it the result that the man has gone outside the sphere. *Honnold on Workmen's Compensation*, § 113, citing *Plumb* v. *Cobden Flour Mills Co., Ltd.* (1914), 7 *B. W. C. C.* 6, and *Whitehead* v. *Reader* (1901), 3 *W. C. C.* 40, *C. A.*

In our own jurisdiction, the resulting accident was held to have arisen out of and in the course of the employment where a house servant used wood alcohol to assist in lighting a fire, in disobedience of orders not to use, for the purpose, kerosene, "or anything like that." This court declared: "The disobedience of orders in this case was a disobedience of orders as to the way in which the work should be done. The work itself was the very work decedent was expected to do. It was done at the very place where it was meant to be done." *Kolaszynski* v. *Klie*, 91 *N. J. L.* 37. It is evident that smoking under such circumstances was not such a wrongful act, entirely outside the scope of decedent's employment, as to exclude a consequent injury from the category of those arising out of and in the course of the employment.

We conclude, therefore, that the evidence affords a basis of rational inference, tantamount to the legal proof of the fact, that decedent's death resulted from an accident which arose out of and in the course of his employment. Compare *Hercules Powder Co.* v. *Nieratko,* 113 *N. J. L.* 195; 173 *Atl. Rep.* 606; *affirmed,* 114 *N. J. L.* 254; 176 *Atl. Rep.* 198; *Manziano* v. *Public Service Gas Co.,* 92 *N. J. L.* 322; *De Fazio* v. *Goldschmidt Detinning Co.,* 87 *Id.* 317; *Muzik* v. *Erie Railroad Co.,* 85 *Id.* 129; *Bryant, Adm'x,* v. *Fissell, supra.* It is a logical inference from all the facts and circumstances that he was then engaged in the rendition of the service for which he was retained. And the injury is traceable to a hazard of the employment; it was a natural consequence thereof. All that is required is that the claimed conclusion from the offered fact must be a probable or a more probable hypothesis, with reference to the possibility of other hypotheses. The test is probability rather than certainty. *Jackson* v. *Delaware, Lackawanna and Western Railroad Co.,* 111 *N. J. L.* 487; *Hercules Powder Co.* v. *Nieratko, supra.* Positive proof is always required where from the nature of the case it appears it might possibly have been had. Failing that, circumstantial evidence, or the doctrine of presumptions, may be relied upon; for, as was said by Blackstone, "when the fact itself cannot be demonstratively evinced, that which comes nearest to the proof of the fact is the proof of such circumstances which either *necessarily,* or *usually,* attend such facts; and these are called presumptions, which are only to be relied upon till the contrary be actually proved." 3 *Bl. Com.* 371. A more exacting rule would require that degree of certainty which could be had only from a credible eye witness.

The declaration claimed to have been made by decedent, as to the work at which he was engaged when the accident befell him, while clearly admissible as part of the *res gestæ,* is, under the circumstances, of little or no probative worth. It is impossible to reconcile this statement with the absence of all other evidence of the claimed fact—evidence that in all human likelihood would be found if such were the fact.

The inherent weakness of evidence of this character is generally recognized. For obvious reasons, it requires close scrutiny; it is to be cautiously received. *Bankers Trust Co.* v. *Bank of Rockville Center,* 114 *N. J. Eq.* 391; 168 *Atl. Rep.* 733; *Pluchino* v. *Piccolo,* 114 *N. J. L.* 82; 175 *Atl. Rep.* 812. Here it is inconceivable that one so sorely stricken—enveloped in flames, and in grievous pain—would, at such a moment, consider offering an explanation of the cause of his misfortune; that is ordinarily reserved for a time when the victim is relatively composed. It results that there was error in the reversal of the judgment of the compensation bureau.

The judgment of the Essex Common Pleas is reversed, and the judgment of the compensation bureau affirmed, with costs.